We'll hear the next case, the first part of the next case. In re. Tribune Company Fraudulent Conveyance Litigation Litigation. May it please the Court, this is Larry Robbins for Appellant Mark Kirshner, the litigation trustee. I'm going to begin with the imputation question in the intentional fraudulent transfer claim against the shareholders. In dismissing this claim, the district court held that the fraudulent intent of Tribune's senior-most management could not be imputed to Tribune unless management effectively controlled the special committee's decision to approve the LBO. This control test for imputation is wrong for at least three reasons. First, basic common law imputation principles tell us that the district court's control test is mistaken. For more than a century, in both civil and criminal cases, the intent of a corporation has been imputed from the intent of its agents. In federal criminal cases, as Justice Harlan explained more than 70 years ago in U.S. against A&P Trucking, it is elementary that impersonal entities, such as corporations, can be guilty of knowing or willful violations through the doctrine of respondeat superior. Or as this court put it more recently in U.S. against 20th Century Fox, once it is determined that the corporate agent willfully violated the law, the corporation must bear responsibility. Indeed, that is true, even where the corporate agent who harbored the wrongful intent lacked control over the ultimate act of criminal wrongdoing. That is the lesson of cases such as U.S. against Short Accountancy Corporation cited at page 32 of our opening brief. And of course, the same holds true in civil cases in which the actual intent of a corporation is an element. Judge Coate, for example, applied common law principles imputing management intent to the corporation in Lyondell, a case materially indistinguishable from this one, and in which Judge Coate reversed the very bankruptcy court decision on which Judge Sullivan relied. The Supreme Court's Staub decision makes precisely the same point. There, as here, the court was construing a federal tort statute and therefore, quote, started from the premise that the statute adopts the background of general tort law. And as this court said in In Re Felin, a fraudulent conveyance is a tort. So Section 548A is likewise governed by basic common law imputation principles. What's striking about Staub is that the Seventh Circuit in that case had applied precisely the control test adopted by the district court in our case. Mr. Robbins. Mr. Robbins. Yes, Your Honor. Mr. Judge Chen, who is it here that you allege had the actual intent to defraud? The complaint alleges, among others, that the CEO of the company, Mr. Fitzsimons, and the CFO of the company had the requisite intent. The district court did not find – did not suggest otherwise, and no party before the court has contested. All right. So the allegation is the officers had the actual intent. And how do you respond to the argument that there was the independent special committee, and it was the independent special committee that made the recommendation or the decision here, and there's no evidence of intent on the special committee's part? Well, I think both the premise of that argument as well as the allegations in the complaint belie the contention. Let me start with the premise. The district court subscribed to Apelli's view that because Section 251 of the Delaware corporate law – of Delaware corporate law – imposes on the special – on the board of directors approval responsibility for mergers, it therefore thought that only the board's intent or those who control the board is relevant. That is, first of all, a misreading of Section 251. That is to say, Judge Chan, even if you thought that Section 251 is a plausible basis for narrowing the range of imputation as a matter of federal common law, which I completely dispute, but even if you thought that, Section 251, if you actually take a look at it, makes clear that there's a whole range of actors whose concomitant conduct is necessary for the approval of a merger. Yes, it's true that the board of directors must approve, but Section 251A also requires a merger agreement, which is almost always negotiated by management. Section 251B says that the merger agreement must be executed and acknowledged by an authorized officer. Section 251C1 requires a majority of the outstanding shareholders to approve. Section 251C2 requires that the corporate secretary or assistant secretary certify the shareholder approval. And the point of this, Judge Chan, a statute that disperses merger authority over so wide an array of corporate actors, plainly has no role in defining whose intent may be attributed to the corporation under federal common law. The correct result, we think, is what the Supreme Court said in Staub, where, as I say, the Seventh Circuit had applied precisely the control test that the district court did in this case. The Seventh Circuit had said that because the employees who possess the wrongful intent did not have, quote, singular influence over the actual decision maker, the intent of the bad actors could not be attributed to the employer. The Supreme Court flatly rejected that standard in favor of a common law proximate cause test for imputation. And I also think, Your Honor, that is the correct reading of this court's more very recent decision in Jackson against Abernathy. As we set out in our 28J letter, this court in Jackson said that the knowledge of certain lower level employees who lacked control over the actionable statement could still be imputed to the company if those employees had at least, as this court put it, connective tissue to the actionable statements. So you have to ask yourself, where exactly did the district court come to decide? What was the basis for departing from these well-settled common law imputation standards? Well, let me just say then very quickly, as we explain in our brief, the standard was extrapolated from a line of so-called transferee intent cases, where in essence the transferee, by virtue of his control over the company, stands on both sides of the transaction. We are obviously not invoking the transferee intent exception in this case. And I'll make one last point. If accepted by this court, the control test would work a sea change across a broad array of cases in which proof of actual intent is likewise required. Imagine, as we suggest in the brief, a company like Enron that engages in some improper deal with a related party, but where the knowledge and intent are siloed only within management. It turns out that under NASDAQ and New York Stock Exchange rules, the audit committee has to give final approval. Does that mean that if knowledge and intent is siloed, as the Supreme Court warned about in Staub, a prosecutor would have to decline the case if it can't prove that the audit committee shared the same wrongful intent to senior management. The problem with the control test, Your Honors, is that it rewards just such failures of internal controls. And departs without basis from more than 100 years of common law imputation standards. And I'll reserve the balance of my time, and I thank the court. May I ask a question, Mr. Robbins? Yes, Your Honor. Mr. Jotaradji, am I correct that the trustee has settled with the directors and officers that you're saying had the requisite intent? I believe that to be correct, yes. Okay. On what theory? On what theory? Did the settlement not actually identify a theory, you know, breach of fiduciary duty, aiding and abetting? What theory was the action pursued against the officers? Well, there were a number of claims against the officers. Originally in the case, there were breaches of fiduciary duty. There were fraudulent transfer claims. I cannot actually tell the court whether one or more of those claims was somehow specified in the settlement agreement. Candidly, I didn't. I was not involved in those negotiations, so I can't. I understand. I thought you might know that. No, I'm sorry. The question I want to ask you is, in this action, which on this claim and others, you're basically looking to claw back from innocent shareholders. What more wrongdoing is it that's being pursued through this fraudulent conveyance action that you weren't able to pursue against the CEO, CFO, and other officers in the action directly against them? Well, Your Honor, if I can quarrel briefly with the premise of the question for just a minute. Certainly. I realize I hope I'm not eating into my rebuttal time. No, that's fine. Don't worry. You'll have your full rebuttal time. Thank you, Judge Chin. First, I don't accept the premise of innocence. I realize that that talking point is repeated many times on the other side's brief, and I understand why it's a rhetorical advantage. But it isn't correct. The large shareholders, the trusts and foundations who remain in this case, were deeply complicit in engineering the LBO. They were also enormous beneficiaries of the fraudulent transfer. Paragraph 118, Your Honor, of the complaint alleges that at least 25% of the payouts went to shareholders, went to the D's and O's, subsidiary D's and O's, trusts and foundations, and the Zelle defendants. The innocence argument is not only false, but also it seems to me legally irrelevant. Whether or not the beneficiaries of a fraud were in on a scheme does not make the scheme any less of a fraud. And it is, of course, sound public policy, it seems to me, that companies don't engage in siloing information so that the person is tasked with approving a multibillion dollar transfer that thrusts a company into bankruptcy through a fraudulent transfer can't invoke a see no evil, hear no evil defense. So I guess the short answer, Judge Radji, to your question is that although we have settled with management and the management were the prime movers in this transaction, which is, of course, why their intent should be and always typically is imputed to the company. It remains a fraudulent transaction from which some $8 billion of money that ought to have gone to creditors and pensioners that I represent were, in fact, distributed to shareholders, many of whom are profited and are anything but innocent. All right, thank you. We'll hear from the other side. Thank you, Judge Chen. May it please the court, this is Doug Hallward-Dremeier on behalf of the shareholder defendant at Belize. I'd like to start with the many ways in which this statute and this case in particular are entirely unique, quite the opposite of Mr. Robbins' suggestion that this would be a fee change in the law. Let's start with the fact that this is a unique standard. The standard of actual intent appears only in the U.S. Code in connection with intentional fraudulent conveyance claims. And that uniquely demanding standard was adopted precisely because, as Judge Radji noted, the liability here is not borne by the employer on the basis of the employer's employee's acts. It's rather borne by entirely innocent transferees. Now, I know that Mr. Robbins has claims against the principal shareholders, and that will be addressed in the next argument. My clients are pension funds, passive investors who simply own shares in one of the country's preeminent public companies. So, with the actual intent standard, Congress specifically distinguished the standard of liability under this statute from the other circumstances in which the intent of any and every employee is imputed to the employer. The standard – I want to note, by the way, that not only was Staub never argued below, neither was this notion of proximate causation or now respondeat superior that Mr. Robbins is advancing, which would ascribe to the corporation and impose liability on innocent transferees when any employee had the requisite intent. What the statute does by saying actual intent of the transferor to defraud creditors, it makes it the intent of the actor within the transferor who effectuated the transfer. And here, again, another aspect of this case that's unique is that Delaware law, section 251B, specifies that the board must adopt a resolution recommending the merger. That distinguishes, again, this from any of the many types of transfers that might be covered by the intentional fraudulent conveyance statute. If it's a run-of-the-mill transfer, of course, many employees would have authority to do it, and it would be the intent of the employee who actually did. In this instance, state law specified that this decision was so extraordinary that it required the board to make the decision. The board delegated that to a special committee of independent directors, and the special committee of independent directors here engaged independent financial advisors, three of them at least, to advise them as to whether this would render the company insolvent. It got two opinions that said that no, it would not, that the company would be able to continue to make payments after the transaction closed. What about the argument that the officers misled the special committee? Your Honor, I think there's more in the characterization of those allegations by appellant than in the actual allegations of the complaint. For example, they suggest that there was a misrepresentation with respect to Morgan Stanley, but the allegations show otherwise. There was no allegation, there is no allegation in the complaint that Morgan Stanley opined that the company would not be able to refinance seven years later. Rather, and this is at paragraph 316, Joint Appendix 256, they said, quote, they were unable to make a representation, unquote, on that question. And when the director, or rather, when the officers relayed that to BCR, they did not say that Morgan Stanley had made such a representation. Rather, and this is at paragraph 317, they said, based on management's best understanding of the debt and loan capital markets and management's recent discussions with Morgan Stanley, management believes that it is reasonable and appropriate for BRC to assume Tribune would be able to refinance. And this is, of course, with respect to refinancing some seven to eight years into the future. So there is no specific allegation of a misrepresentation of a representation by Morgan Stanley there. Likewise, with respect to the other supposed misconduct by the officers, they point out the valuation. I'm sorry, go ahead. No, I don't think. Go ahead. Sorry. They suggest that there was a misvaluation of the phone's debt. But again, the complaint actually says that the number taken was derived from the company's financial statements pursuant to financial accounting standard number 133. So obviously, this was a question of valuation that required the application of expertise, no allegation of fraud. Even with respect to Mr. Robbins' suggestion that the complaint specifically alleges intent on the part of the officers, I draw the court's attention to paragraph 379, which is the principal paragraph of count one, which is the actual fraud count, subparagraphs B and C. What they allege was that the officers knew or were reckless or grossly negligent in not knowing that the LBO would render Tribune insolvent. That is a far cry from suggesting an actual intent to defraud the creditors of Tribune by engaging into an LBO. I go back to the theory of how unique this case is. This case is not the quintessential intentional fraudulent transfer where somebody is engaged in an accident, knows they're going to be sued, goes home and transfers the house to their child. This transaction took place in the public securities markets under the harsh light of day with the scrutiny of Wall Street analysts of very sophisticated lenders who are lining up to lend to this LBO with the investment of a very successful investor in Sam Zell. All of that sets this far apart from the types of cases that Mr. Robbins is relying on. I do want to get to Staub because Mr. Robbins relies so heavily on it. Staub did not involve an actual intent standard. The standard of liability addressed in Staub was a motivating factor. Now, a motivating factor, the court said, was consistent with a notion of proximate cause. The court went on to say that, of course, an injury could have many proximate causes. In other words, there could be many multiple actors acting even perhaps with different intents. The statute we're concerned with here actually requires the actual intent of the debtor, which suggests that it is the intent of the actual decision maker that matters. And the Supreme Court has been very clear that when Congress uses this word actual, which might in some respects seem superfluous, it's doing so to underscore that this is not supposed to be intent that is imputed to the corporation. And specifically in Entel and then in Gebser, the court distinguishes this notion of actual knowledge from imputed knowledge, respondeat superior liability, or constructive knowledge. And yet that is what Mr. Robbins has tried to make the actual intent standard into by citing his series of tort statutes in which it's the employer who is seeking to be held liable on the basis of the employer's own acts. One minute. You have one minute. I think Gebser is very instructive here. In Gebser, the court said that the district had no knowledge. Now, of course, the employee who is engaged in the wrongdoing did have knowledge of the wrongdoing, and the dissenters in Gebser said that that was enough. The employees' knowledge could be imputed to the district. But in order for the district to have liability there, they said that it was not sufficient for it to be respondeat superior or vicarious imputed liability. Rather, it was necessary that it be an official decision of the recipient, which required actual knowledge of an official with authority. Here, there is no allegation that the independent directors who made up the special committee had an actual intent. In fact, they specifically engaged independent financial advisors who did an independent analysis and provided them with advice that the tribune would be solvent after the deal. To the extent that the trustee alleges that the independent financial advisors should have done a better job, that does not equate to the statutory standard of actual intent. Thank you very much. All right. Thank you. Mr. Robbins, you have some rebuttal time. Yes. Thank you, Judge Chin. I'm going to try and make four or five points very quickly. We lost count one for one reason only. It was because of the control test for imputation. I did not hear Mr. Hallward-Dremeier defend that proposition. He did try, however, to minimize its consequence. First, by saying that actual intent only occurs in a handful of statutes relating to fraudulent transfers. Not so. It is the legal equivalent in all material respects of every single federal felony statute on the books, all of which require the same actual intent, sometimes called specific intent, sometimes called just plain intent. But it's the same rule, and for more than a century, in federal criminal prosecutions, common law imputation standards have applied. Point two, the suggestion that we did not argue the proximate cause standard below is false. In our memorandum in opposition at page 26, counsel for the plaintiffs specifically said that the officer's intent should be imputed so long as they had a, quote, causal effect on the LBO. Page 26 of the memorandum in opposition. The third point, that Staub is supposedly irrelevant because it deals with some particular statute, also false. The Supreme Court could not have been clearer that it was construing the statute as it did because it was a federal tort statute and therefore was governed by the background principles of federal common law of torts. So too here. Section 548 is a tort, and it adopts the background principles of federal tort law. Gebser is irrelevant. That's point four. Gebser said in so many words that it was not applying common law principles because, as the Supreme Court read title six, summary title nine, which was the subject matter of Gebser, and contrasted it with title seven, they said specifically, we do not have a warrant in this case to apply common law principles. They have been foreclosed. This case is entirely different. This case is like Staub, where the background principles of imputation applied for 100 years in every context should have been applied here. And the last point I'll make is that if the court nevertheless adopts the control test on the basis of which our count one was dismissed, we believe for the reasons we've stated in our brief that we've alleged that the special committee did in fact have the requisite intent, but we think the imputation standard is so plainly false that the court need not reach that issue. And I thank the court for its time this morning. Do you agree that you would attribute liability to the corporation or the company in those circumstances, or is there a limiting principle to your argument? I think Your Honor has identified a challenge in this body of law that's persisted for a long time and that has spawned a surprisingly large volume of tenure pieces in law reviews. Mercifully, this case requires no such limiting principle. In this case, it's the CEO and the CFO who carried out the fraud, who lied, who created a false set of projections, covered them up until step one closed, lied to the valuation firm. We don't have to look very far down the food chain to the person in the mailroom. This is the guy at the top. And I just don't know of a single case in which the CEO's wrongful intent has not been imputed to the company, even when you're putting the company in corporate jail. And so I recognize that there may be limiting principles, and I just don't think the court needs to wrestle with where the line is, because we are way over the line, Your Honor, in this case. And unless the court has any other questions, I think I guess we, Judge Chin, would move on to the next. We'll move on to the controlling shareholders. And you're still up, then. Yes, thank you, Judge Chin. This is, again, Larry Robbins, for the record, for the plaintiff. The trustee has alleged that the trust and foundations aided and abetted breaches of fiduciary duty by tribunes, officers, and directors in violation of Delaware law. The district court dismissed that claim on the ground that the trustee had not sufficiently alleged insolvency at step one of the transaction. That holding rests on two independently reversible mistakes about controlling Delaware law, which everyone, including the district court, understood to control the inquiry. The first error has to do with the collapsing of the two steps. It's our submission. And let me just say the district court recognized and agreed that we'd shown we'd sufficiently alleged insolvency at step two, but held that the step two debt could not be considered in assessing solvency at step one. So the first error is with respect to whether these two steps should be collapsed. In the district court's view, the Delaware law doesn't permit collapsing unless the second step was, quote, certain to occur after the first step. Now, appellees tell the court that the district court didn't actually apply a certainty test for collapsing. But frankly, there's just no other way to read pages 14 to 15 of the court's opinion. This is what the court said, quote, even after step one closed, it was never certain that step two would occur. Unless anyone missed the import, the court italicized the word certain. The court then reiterated the point on the next page. Step two, the court said, quote, never became inevitable. And for good measure, the court then contrasted the LBO, the Tribune LBO, with the transaction in Sabine, in which the district court said the second transaction, quote, could not have been stopped or reversed. No one before the court this morning will defend a certainty test for collapsing under Delaware law. The correct test has been set out in no fewer than four recent Delaware cases. A pair of 2019 decisions by Vice Chancellor Laster, Williams Field Services, and PWP Zerion Holdings. A 2011 decision by Vice Chancellor Glasscock in Coughlin v. NXP, which is a 2011 Westlaw 5299491. And a 2018 decision of Chancellor Bouchard in Carr against New Enterprises Associates. These cases and others make clear that there are three alternative and independently sufficient tests for collapsing, none of which require certainty. And we need all of them. We certainly meet the so-called end result test. No one can seriously dispute. I wanted to ask a different question. I mean, the collapsing issue, of course, is there, but what about whether the large shareholders had a fiduciary duty? I mean, what is the basis for that? Well, we contend that they had sufficient control in their own right. And I'm happy to answer the question, but my initial submission, Your Honor, is, of course, that if they are alleged to have aided and abetted the fiduciary breach by management, we wouldn't have to show that they were fiduciaries in their own right. But if I if I did have to defend the proposition that they were fiduciaries in their own right, I would point to the following allegations in the complaint, that they're showing that they held 33 percent of the shares and four of 11 board seats, that they threatened management, that if it didn't take prompt action to arrest the losses of stock value, they'd lose their jobs. By the way, the shareholders say at 32 of page 32 of their brief that the complaint provides no specifics on that thread and they cite Joint Appendix 300. But they fail to read the whole complaint. Paragraph 132 on J.A. 185 quotes Mr. Steinhardt, the trustee for the Chandler Trust and a board member, threatening, quote, possible changes in tribunes management and quote, if nothing was done to enhance stock value. But to get back to the point, you have one minute. Oh, well, OK. I apologize then. Let's just say that the we believe we've met all three tests, each of which is independently sufficient. The end result test, the interdependence test and the binding commitment test. And none of them requires that step to be certain. The last point I'm going to make then is the so-called cash flow test for insolvency. And here the district court, constrained by this court's decision in Pereira from 25 years ago, thought that Delaware cash flow insolvency law requires doesn't permit a district court to look to debts that are yet to mature. That may have been true when Pereira said that 25 years ago, although frankly, I doubt it. But it is absolutely not true now. There are a series of cases from Delaware. But let me just point to one of them. The Delaware Bankruptcy Court applying Delaware insolvency said in 2008 in In Re Teleglobe point blank, quote, the cash flow test is forward looking in the sense that it is not enough to be able to meet current obligations. The first the firm must be able to meet its future obligations as well. I'd also cite production resources, quadrant structured products, which look to future dividend obligations in performing its cash flow analysis. In ReGenius biotechnology, which looked at the future repayment obligations in assessing insolvency. And of course, it's well settled that federal appellate courts are obligated to defer to state court constructions of their own law, even in the face of a contrary panel decision such as Pereira. And to that, I cite. Yes, sir. Does Delaware law give us any guidance as to how far out we look to see if debt obligations are going to be payable? I have not seen anything that states, Your Honor, Judge Raggi, a hard and fast view on that. But again, this case doesn't call upon the court to draw a terribly bright line. For one thing, the district court flatly refused to look at even a debt that would come due the next day because that because the court thought that's what Pereira required the court to do. The second thing is this was a debt that was highly likely to come due, as we allege in the complaint in multiple paragraphs, including 211, 225, 26, 229, 238 and 240. And it was going to come due within six months, as indeed it did. Step one closed in June. Step two closed in December. And then the company was catapulted into bankruptcy within the within the following 12 months. How is it all should I'm sorry. How is it all? Should it inform our consideration of this? Step two required government approval. I think, Your Honor, that doesn't change the analysis under Delaware law. Delaware law begins by asking, was this transaction cast from the outset to achieve a certain result? Nothing could be plainer than that. Step two was essential to the very rationale of this deal. Step two doesn't close. This company doesn't become a subchapter S company. It doesn't become entitled potentially to claim a billion dollars in tax benefits, which Sam Zell's company is alleged to have said publicly was the only rationale for this transaction, making even a lick of sense. May I just ask you to explain that a little more? Because my concern is, is that I thought step one achieved one of the principal objectives, which was getting cash into the hands of shareholders. But what you did to a significant degree, even if step two would was never approved and never consummated. So in that sense, I'm not sure I understand your premise that step two was essential to the object that step one was pursuing. Help me out. Yes, there's no question, Judge Raji, that certain of the trusts and foundations wanted off the ski slope as early as possible. That's why they asked for an early payout as a step one transaction. I grant that, but I don't think that changes the analysis under Delaware collapsing law. Delaware collapsing law asks, among other things, was the transaction cast from the outset to achieve certain purposes? This transaction, the only rationale for the overwhelming rationale, the only way it made sense to the merging entity was to achieve what step two permitted. If step two doesn't happen, there's no subchapter S. Half of the shares are still publicly traded. The company doesn't go private. Sam Zell doesn't own it. His entire rationale for doing this deal evaporates. Yes, it's true. In step one, some of the trusts and foundations got a big payday. That's why they wanted a two step transaction. But again, the fundamental attributes of collapsing law in Delaware make clear that, you know, there's no there's no requirement that step to be certain. And respectfully, that's the reason we lost this part of this count. Judge Sullivan thought that there is a certainty test for collapsing. And there is. You have some time for rebuttal. Let's hear from you. Thank you, Judge. Thank you, Your Honors, and may it please the court. Aaron Murphy, on behalf of the trust and the foundation. The district court dismissal of the trustee state law claims was correct in every respect. The trustee concedes, I take it, I take the trustee to concede this morning that each of those claims is dependent on whether Tribune was rendered insolvent by the step one transaction. And I take him to concede that he's not alleging that the step one transaction scanning alone rendered Tribune insolvent. Instead, it claims to depend on proceeding if Tribune had already incurred at step one. The step two that said it didn't actually incur until six months later and that it couldn't incur unless and until multiple conditions were satisfied, including that critical approval by a government agency. And neither of the theories the trustee has offered work for purposes of trying to get to that result. The trustee first argues that the district court should have collapsed the step one and step two transactions and treated them as if they were one unitary LDO transaction. But that argument really requires the court to disregard not just the form, but the substance of these two distinct transactions. These transactions weren't separated out to try to disguise the fact that the tender offer was part of an LDO strategy or to try to mask the amount of debt that the LDO would end up entailing. By the trustee's own telling, the step one tender offer was conducted up front because shareholders had real concerns that the step two LDO might never come to pass because it was subject to those independent conditions like approval by the FCC, an independent solvency opinion analyzing step two itself, shareholder approval as to step two itself, things that had to happen after step one in order for step two to proceed. And ultimately, his whole theory in this case is that various officers and managers of tribune had an obligation to stop step two from happening long after step one closed. So I don't take him to disagree with the district court's understanding of how these transactions operated. Instead, he's just arguing that the district court applied the wrong test and that Delaware law would allow courts to collapse transactions, even when they are in substance distinct transactions, so long as they were both intended to further some sort of single end result. That's just not the way Delaware collapse law works. Nothing in the cases he cited stands for this proposition that so long as two transactions are part of a single strategic objective, you can collapse them. And that really couldn't be the law because if it were, you'd be collapsing transactions right and left because all sorts of strategic corporate objectives require multiple different transactions and steps along the way to accomplish them. What the end result formulation is asking is just the same thing as being factors and as really every other articulation of the collapse doctrine, which is what is the substance of these transactions? Do they have independent substance? Can they stand alone? You know, even if they're related to each other, could they stand alone? Do you understand them, what they're accomplishing, what the parties were intending to accomplish, even if both don't happen? Or are they such that they only are designed to accomplish one and only one result? And if one doesn't go forward, the other basically couldn't go forward and would have to be unwound. And under that application of that kind of settled collapse principles that are really just about substance over form, it's just clear here that as a matter of substance, the step one transaction was designed and intended to be able to stand even if the step two transactions never came to pass. How is that decided as a matter of law, Ms. Murphy? How is that decided as a matter of law? Sure, I think it's designed and intended for that purpose. I think the reason it can be decided as a matter of law is because the trustee's own allegations in his complaint acknowledge both that as a factual and practical matter, step one could stand alone and step two might never come to pass, and acknowledge that the reason for the step one transaction was not some sort of formality to try to disguise what was really one transaction, but was rather because of what Your Honor noted earlier, shareholders wanted a transaction up front that would give them the opportunity to get value, even if this LDO didn't happen. Those are his own allegations, and I'd point you to paragraph 149 and 240 of the complaint, where the trustee is alleging that it was because the foundations and trust had concerns about the LDO that they wanted basically a strategy that said, you know, put your money where your mouth is and give us something up front that protects us against that risk. So I think you can decide that as a matter of law here, because there really doesn't seem to be any dispute about the fact. It's just a dispute about whether it's the subpoena factors of the step transaction doctrine applies in a context like this one. Now, I think for basically the same reason, this kind of backdoor effort to get the step two debt in through the solvency analysis failed as well, because what the trustee seems to miss is that Delaware law doesn't, it focuses only on liabilities that actually exist. A contingent liability actually exists. You have obligated yourself to pay money in the event something comes to pass. It's just that whatever that trigger is may not yet have come to pass. That is not how these transactions were structured. Tribune did not have an obligation to proceed with step two. It couldn't have an obligation to proceed with step two at the time of step one, because it couldn't proceed with step two unless and until it obtained things like independent government agency approval and an independent solvency opinion. So all that was, and this is, again, it comes from the allegations in their own complaint where they're talking about the merger agreement. The trustee acknowledges that all Tribune was obligated to do was make reasonable best efforts to satisfy the conditions that were necessary to put Tribune in a position to take on that step two debt. And so what they're really talking about here, thank you, Your Honor, is not a contingent liability in the sense of something that there's a legal right to payment, but the trigger hasn't happened yet. They're asking you to take into the solvency analysis a debt that Tribune had not taken on at step one and might never have taken on at step one. And there's just no support in any of these cases that they're pointing to for the notion that you take into account non-existent debts when doing a solvency analysis. The closest thing to the test that they're talking about here is a zone of insolvency type test that asks if you're a solvent corporation that's operating in a manner where you're likely to become insolvent. But the Delaware Supreme Court explicitly rejected a zone of insolvency test in this context, saying we don't want to put directors in the position of having to operate as if a company is insolvent when it's actually solvent. That's a decision that came after this court's decision in Pereira. So, if anything, I think it's just even clearer now as a matter of Delaware law that the type of analysis they're asking you to do, looking way into the future, a debt that didn't exist at the time that the solvency analysis was conducted would be absolutely contrary to Delaware solvency law. Thank you, Your Honor. Thank you. Mr. Robbins, you have some rebuttal? Yes, thank you, Judge Chin. Very quickly, on collapsing. We lost the collapsing issue because the district court thought that step two had to be certain. That's the holding of the case. There's no other way to read pages 14 and 15, and understandably, I did not hear Ms. Murphy defend that proposition. It is not defendable under Delaware collapsing law. The cases that I've cited make perfectly clear that step two did not need to be certain in order to be collapsed. And the best case I can offer is Williams Field Services from 2019 by Vice Chancellor Laster, where the second step in that transaction, the so-called IPO, the upscale IPO, was expressly uncertain to happen, and nevertheless applying the end result test, one of three alternative independently sufficient tests for collapsing under Delaware law. Judge Vice Chancellor Laster collapsed the transactions. We have alleged abundant reasons why these are a single integrated transaction, but I would call the court's attention specifically to paragraphs 238 to 243 of the operative complaint for the allegations that justify collapsing. I don't think I heard any – I don't think I heard a defense of Pereira in Ms. Murphy's argument, and indeed, it is not defendable. And again, just to separate the forest from the trees, we lost the cash flow solvency issue at step one by virtue of nothing other than the force of Pereira, which Judge Sullivan understandably thought forbade him to look at future debt. Pereira is no longer good law, if it ever was. I've cited a series of cases, including in my argument this morning, that make abundantly clear that Delaware law does indeed look to future debts in calculating, in determining whether or not a solvency test has been satisfied. Pereira thought otherwise. It was wrong then, but it is assuredly wrong now, and this court has an obligation to take Delaware law as it finds it. And I thank the court for its time this morning. Thank you. We'll move on to part three, and we'll hear from Mr. Lack. May it please the court, Robert Lack, Plaintiff Appellant Marcus Kirshner, the litigation trustee. I will address the claims against the financial advisors in both appeals. In dismissing the claims against the financial advisors on the basis of the affirmative defense of Impari delicto, the district court disregarded the express allegations in the complaint that support the adverse interest exception to the defense, and improperly resolved competing inferences in defendants' favor. The complaint set forth in great detail how tribunes' officers and directors were acting solely to benefit themselves, the controlling shareholders, and Zell, and that their actions did not benefit tribunes or serve any corporate purpose. These allegations, which were entirely plausible, should have been credited on a motion to dismiss. The district court was wrong in saying that Zell's cash infusion established a benefit to tribune as a matter of law. All of that money was alleged merely to have flowed through tribune to the shareholders, lenders, and advisors. Nor did the ESOP structure confer any tax benefits. As the trustee alleged, the tribune was rendered insolvent and would not have any taxable income to shelter. Perhaps at trial, the jury will find that in addition to intending to benefit themselves and hinder delay in defraud tribunes' creditors, the directors and officers also acted to advance some corporate purpose. If so, the Impari delicto defense will ultimately prevail, but that is not a question for today. On a motion to dismiss, any doubts must be resolved in favor of allowing the case to proceed. In any event, under Delaware law… Why wasn't there some benefit to the corporation with the influx of additional capital? Unlike in the Zelli case cited by the defendants, there's no allegation here that the money, the $306 million Zell put in, was used to fund tribune's operations or to purchase corporate assets. It immediately went out of the company to pay shareholders and lenders, including in step two, Zell's entity, EJITRB, and advisors. Why is payment to lenders not benefiting the company? In fact, the debt that was taken on was greater than the debt that had previously existed and had higher interest rates. You were increasing the burden on the company, so there was no benefit to the company from taking on greater debt at higher rates. So that would not constitute a benefit, and it did nothing to help the operations, or it did nothing for the creditors when it rendered the company insolvent. In any event, under Delaware law, Impari delicto does not protect professional advisors who aid in the debt breaches of fiduciary duty. Although the district court cited the Stewart case, it did not apply the fiduciary exception set forth in that case, which was adopted by the Delaware Supreme Court. As Morgan Stanley and VRC acknowledged in the district court, state law determines if Impari delicto applies, and this court recognized in the White case, WIGHT, that the Wagner rule derives from state law agency principles. The district court was thus obligated to apply the Delaware fiduciary exception under either Impari delicto or the Wagner rule. The financial advisors were all hired to protect Tribune and help its directors and officers fulfill their obligations. City Court Merle and Morgan Stanley were, in effect, tasked with auditing VRC's work, but looked the other way when flawed projections and nonstandard valuation techniques were used. These allegations suffice under Delaware law to preclude dismissal of the aiding and abetting claims on the basis of Impari delicto. The financial advisors argued that they were not gatekeepers, but the complaints and allegations make this an issue of fact. I'll reserve the balance of my time. Thank you. We'll hear from the other side. Thank you, Judge Chin. Cannon Shanmugam of Paul Weiss for the Appellees in No. 19-449. May it please the Court, Judge Cote correctly dismissed the claims against Citigroup and Merrill Lynch, which served as arm's-length non-fiduciary advisors that solicited bids from parties interested in purchasing Tribune and advised Tribune as to those bids. The trustees' claims fail as a matter of law. Now, Mr. Lack this morning focuses exclusively on the claims for aiding and abetting breaches of fiduciary duties and for professional malpractice, and so I'll focus on those claims this morning. On those claims, the District Court correctly held that the claims were subject to the Impari delicto doctrine and could not be saved by the adverse interest exception. That exception applies only where the alleged misconduct solely benefits the participating corporate insiders. The trustees' reliance on a different exception, the insider exception, is forfeited and also lacks merit. Delaware law has never extended that exception beyond quasi-fiduciaries such as auditors to non-fiduciary advisors such as appellees. Now, on the adverse interest exception, that exception applies where, as an objective matter, the participating corporate insiders were acting solely to advance their own personal interest rather than that of the corporation itself. In footnote 4 of his brief, the trustee concedes that a short-term benefit can be sufficient to satisfy that standard, and there's no dispute here about the relevant facts. If you look at the chart on page 34 of the trustee's brief, which is taken in turn from the complaint itself, that chart makes clear that the $300 million in new capital that was injected into Tribune was used for, among other purposes, paying off pre-existing debts and also repurchasing shares. Those are sufficient benefits to constitute corporate benefit, and at a minimum, those benefits illustrate that this was not a transaction where the insiders were acting solely to advance their own personal financial interest. There's a good reason why this exception applies only to cases involving theft or embezzlement or similar misconduct. Mr. Lack argues that the payment to the lenders resulted in an increased debt burden on the company, but, of course, that's always true of a leveraged buyout, and it illustrates that if the trustee's argument were accepted here, any leveraged buyout would be subject to the adverse interest exception. On the insider or fiduciary exception, we point out that the reliance on that exception is forfeited because the trustee made no effort to invoke that exception or to rely on Stewart, even though it came down almost four years before the district court's ruling on the motion to dismiss. But in any event, that exception is plainly inapplicable here. In Stewart, the court said that the insider or fiduciary exception applies only to entities that occupy a position of trust within the borders of the corporation. But here, appellees were acting as outside advisors, and not just any sort of outside advisors. They were operating at an arm's length, and their engagement agreement took pains to make clear that they potentially had a conflict of interest by virtue of their involvement in the lending aspects of this transaction as well. And so extending the insider exception to these circumstances would go further than the Delaware courts have gone, and would again eviscerate the impari delicto doctrine by permitting claims by a wrongdoer corporation against a wide array of third-party actors in derogation of the purpose of the insider exception, which is simply to allow corporations themselves to go after corporate insiders who have engaged in wrongdoing. Unless the court has any questions, we would ask that the judgment as to Citigroup and Merrill be affirmed. Thank you. Thank you. We'll hear from your colleague, Mr. Polks. Spokes? I'm sorry that they're leaving my phone on mute. It's okay. Judge Shen, thank you for that. Good morning. This is Jonathan Polks from Weill Gottschall. And I just want to add to the arguments that we agree with that the court just heard that separate and apart from impari delicto, the federal standing doctrine of Wagner is very directly on point. And I'd like to just point the court first to the language of Wagner, which is at the case in Westlaw, page three, that says when a bankrupt corporation, which is what we have here with you again, has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors. There are a series of damning admissions in the papers that were submitted in the briefs by the trustee in which they candidly admit that they are seeking damages, quote, for the benefit of the creditors. And I think with that, they are squarely within the Wagner doctrine. This is exactly the kind of case where claims by trustees seeking damages for creditors like this have been rejected over and over again. Thank you. Unless there are any questions, I'll yield the rest of my time. Thank you. Mr. Lack, you have one minute for rebuttal. Yes. Let me start with the point about forfeiture. Stuart was not cited in district court because it had not been decided in 2014. Nevertheless, Judge Cote was plainly aware of it because she cited repeatedly in her opinion. And therefore, there was no forfeiture, no waiver, no unfairness in raising this argument on appeal, especially because in the district court, a similar argument about the need to hold gatekeepers responsible was made by the trustee. The Stuart opinion is not limited to fiduciary advisers. Wilmington Trust, which was held liable for aiding, essentially liable for aiding and abetting, was not a fiduciary. It was an outside entity, just like Merrill Lynch and Citigroup. With respect to page 34, the chart shows, if you look at the chart, if you look at the amount that came in from the LBO, the $10.7 billion additional debt, and you add the $300 million from Zelle, you'll see that it was exhausted in the payments to the cash to the old lenders and the existing shareholders. None of that money ended up going into the benefit of the company itself at all because more cash went out than went in. And also, with respect to repurchasing shares being a corporate benefit, the law clearly it is not. On page 34, we cite the cases that say that if a company repurchases shares, it is not a corporate benefit. And with respect to Wagner, the trustee is plainly seeking the recovery in injury to Tribune itself as a result of the financial advisers' malpractice, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty. That is a claim for Tribune, and the fact that Tribune's litigation trusts beneficiaries, including creditors, does not change the fact that it is a claim on behalf of Tribune that Tribune has standing to bring. Thank you, Your Honor. Thank you. Thank you to all counsel. We will reserve a decision as to all three parts of the case. The last case is on submission. Accordingly, I'll ask the deputy to adjourn.